# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ALVERNEST KENNEDY,

   Plaintiff,

  v.               Case No. 13-C-004

DR. C. A. HUIBREGTSE,
DR. KENNETH ADLER

   Defendants.

## DECISION AND ORDER DENYING
## MOTIONS FOR SUMMARY JUDGMENT

   Plaintiff Alvernest Kennedy, who is currently serving a sentence in the custody of the Wisconsin Department of Corrections (DOC), filed this pro se civil rights action against Charles Huibregtse and Kenneth Adler, both physicians employed by the DOC to provide health care for inmates serving sentences in Wisconsin Correctional Institutions. Kennedy claims that both physicians violated the Eighth Amendment proscription of cruel and unusual punishment by their deliberate indifference to his serious medical needs which he claims resulted in their failure to diagnose and effectively treat his thyroid cancer. Kennedy also alleges that their errors and omissions constitute negligence in the form of medical malpractice under Wisconsin law. He seeks compensatory and punitive damages totaling $1.6 million.

   Currently before the court are the parties' cross motions for summary judgment. After both motions were fully briefed, Kennedy filed a motion for appointment of counsel. For the reasons that follow, the motions for summary judgment will be denied, as will Kennedy's motion for appointment of counsel.

# I.  BACKGROUND

On October 12, 2011, Kennedy was transported from Jackson Correctional Institution (JCI) to the Black River Falls Memorial Hospital Emergency Room for evaluation after he complained of difficulty swallowing and a sense that something was in his throat.  A CT scan was done and hospital staff noted that it showed a heterogeneous enlarged thyroid with nodules, otherwise normal. Hospital staff assessed thyromegaly with thyroiditis, thyroid nodules and recommended prednisone and an urgent endocrinology ENT referral for further evaluation and treatment.  (ECF No. 38-1 at 99–105.)  Upon Kennedy's return to JCI, Dr. Adler prescribed prednisone and directed JCI medical staff to make an endocrinology appointment for further evaluation at the University of Wisconsin Hospital and Clinics.  On October 25, 2011, Kennedy was transported to that facility for a fine needle aspiration of three nodules on his thyroid.  A staff pathologist concluded that two of the specimens were negative for malignancy and consistent with a benign thyroid nodule.  The third, however, was "suspicious for a follicular neoplasm."  (*Id.* at 133-34.)  Upon further evaluation by UW staff, a total thyroidectomy was recommended.  The procedure was approved by DOC, and the surgery was completed at the UW Hospitals on December 7, 2011.  The post-surgical pathology report revealed papillary thyroid cancer and follicular thyroid cancer.  On January 20, 2012, Kennedy underwent a metastatic survey at the UW Health West Clinic.  Although the survey did not exclude the existence of residual malignancy, it showed no evidence of distant metastatic disease.

Notwithstanding the successful treatment of his thyroid cancer at public expense, Kennedy claims that Dr. Huibregtse, who oversaw his treatment during the three years he was at Red Granite Correctional Institution (RGCI), and Dr. Adler, who oversaw his care after he was transferred to JCI on November 12, 2012, were negligent in the care and treatment they provided.  Kennedy also claims

2

that the doctors violated his Eighth Amendment right against cruel and unusual punishment by their deliberate indifference to his serious medical needs. Kennedy alleges that he had been complaining about problems with his throat and with swallowing for four years, before he was finally allowed to undergo testing that proved he had thyroid cancer. For the three years he was at RGCI, Kennedy alleges, Dr. Huibregtse continued to mis-diagnose his condition and provide ineffective treatment. And then, following his transfer to JCI in November 2010, Kennedy alleges that Dr. Adler, after initially ignoring his complaints, finally discovered the lump/goiter on his neck during an examination on May 31, 2010. Dr. Adler then ordered an ultrasound of his thyroid which confirmed that he had an enlarged thyroid with multiple nodules, a clear indication, Kennedy claims, of a need for further testing to rule out cancer. Despite this fact, Kennedy alleges that Dr. Adler inexplicably waited three-and-a-half months before arranging for him to be seen by a specialist who ultimately confirmed the cancer. Kennedy contends that the delay in diagnosis and treatment caused him needless pain and suffering and allowed his thyroid cancer to spread, increasing his chance of relapse. He believes that if the defendants had complied with their duties, he would not have undergone a total thyroidectomy.

## II. ANALYSIS

### A. Summary Judgment Standard

The court is required to grant summary judgment if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. "If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (internal citations omitted). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997).

Summary judgment can be particularly useful for a defendant who is convinced that the plaintiff cannot prove his case because it is the plaintiff who has the burden of proof at trial. Rather than incur the expense of a full trial, such a defendant can simply inform the court of the basis for its motion, and identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The defendant does not have to prove a negative, however, by disproving the plaintiff's claim. *Id.* ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim."). As interpreted by the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. In other words, "[t]he moving party is 'entitled to a judgment as a matter of law' [when] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323. There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *Ramos v. City of Chicago,* 716 F.3d 1013, 1014 (7th Cir. 2013). The evidence to be considered by the court includes depositions, answers to interrogatories, and admissions on file, together with any affidavits or sworn declarations. Fed. R. Civ. P. 56(c). "An affidavit or declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Moreover, to defeat a properly supported motion for summary judgment, the nonmoving party must adduce more than "a scintilla of evidence" in support of its claim. Rather, a party opposing summary judgment must present "evidence on which the jury could reasonably find for the nonmoving party." *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005).

## B. Deliberate Indifference To Serious Medical Needs

The Eighth Amendment proscribe's cruel and unusual punishment. U.S. Const., Amend. IIX. The Supreme Court held almost thirty years ago that prison officials' deliberate indifference to the serious medical needs of inmates constitutes cruel and unusual punishment within the meaning of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "This is true," the Court held, "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). This rule follows from the fact that because they are confined in prisons, inmates are unable to seek medical care on their own and are therefore dependent on those who run the prison:

5

An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, .... the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

*Id.* at 103–04 (internal quotations and citations omitted).

The *Estelle* Court cautioned, however, that not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment:

[A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

*Id.* at 105–06 (internal quotations omitted).

A claim of deliberate indifference to serious medical needs has two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). There is no dispute that thyroid cancer is a serious medical condition. The issue presented by the defendants' motion is whether Kennedy has any evidence from which a reasonable jury could conclude that either of the defendants were deliberately indifferent to his medical condition.

Deliberate indifference is a subjective standard. *Id.* at 751. "To demonstrate deliberate indifference, a plaintiff must show that the defendant 'acted with a sufficiently culpable state of

mind,' something akin to recklessness." *Id.* (quoting *Johnson v. Snyder*, 444 F.3d 579, 585 (7th Cir. 2006)). "A prison official acts with a sufficiently culpable state of mind when he knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Id.* (citing *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). Deliberate indifference "is more than negligence and approaches intentional wrongdoing." *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir.1998). And as already noted, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). "A jury can infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Id.* (quotation marks omitted). A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that "no minimally competent professional would have so responded under those circumstances." *Roe*, 631 F.3d at 857 (quotation marks omitted).

## 1. Dr. Huibregtse

The almost 200-page medical record does not support Kennedy's allegation that Dr. Huibregtse was deliberately indifferent to his serious medical needs. The medical record, consisting of Health Services Request (HSR) forms submitted by Kennedy and the records of examination and treatment by the physicians and nurses who work in the Health Services Unit (HSU) of the institution, demonstrate that during the time he was at RGCI, Dr. Huibregste was treating Kennedy for what appeared to be a chronic sinus problem. At no time, according to the records, did Kennedy report to Dr. Huibregtse that he had a lump in his throat or on his neck.

Kennedy was transferred to RGCI on September 19, and was first seen by Dr. Kennedy on December 17, 2007. (Decl. of Charles Huibregtse, M.D., Ex. 101, ECF No. 38-1 at 6, 14.) At the initial visit, Kennedy requested a different antihistamine or decongestant for his complaints of frequent sneezing and watery nose and eyes. Dr. Huibregtse noted that his prescription for Chlorpheniramine, an antihistimine, had not been very effective and made Kennedy sleepy. On examination, Dr. Huibregtse found that Kennedy's nose was congested but that his mouth and throat were without inflammation or discharge. Based on the exam, Dr. Huibregtse assessed rhinitis, a condition marked by allergy-like symptoms. Dr. Huibregtse made a plan to discontinue the Chlorpheniramine and prescribed Loratadine, another antihistamine, for allergies and runny nose. Dr. Huibregtse further ordered a follow-up pending lab results and audiogram. (Defs.' Proposed Findings of Fact (DPFOF) ¶¶ 21–24.)

Dr. Huibregtse again met with Kennedy on February 27, 2008, to address his complaint that he had trouble clearing phlegm from his throat. Kennedy stated that he had previously been diagnosed with Chronic Obstructive Pulmonary Disease (COPD), and Dr. Huibregtse noted that Kennedy had a twenty-year history of smoking. On exam, Dr. Huibregtse noted that Kennedy did not feel a lot of post-nasal drainage but did have some occasional yellow mucus from his nose. No fevers or facial pressure were noted. Dr. Huibregtse assessed chronic cough and clearing throat with uncertain etiology and made a plan to rule out a subclinical sinusitis and COPD. Kennedy claimed that a medicine he had taken in January, an oral antibacterial called Augmentin, did improve his symptoms, and he stated he would like to take it a little longer. Kennedy also requested Guaifenesin

to loosen up the mucus. Dr. Huibregtse prescribed Augmentin and Gauifenesin and ordered a spirometry (pulmonary function test). Dr. Huibregtse further ordered labs and a follow-up pending spirometry results for shortness of breath and chronic throat clearing. (*Id.* ¶¶ 25–30.)

On April 24, 2008, x-rays were taken of Kennedy's sinuses. Consulting physician Richard Clutson, M.D., noted that the x-ray suggested possible mucosal thickening associated with left maxillary sinus but that this was very subtle. He noted no air fluid levels, bony destruction, or erosion. Dr. Huibregtse saw Kennedy for a follow-up visit on May 30, 2008. He noted that Kennedy had tried several medications without relief and that Kennedy continued to have yellowish purulent drainage from his nose and in the back of his throat. Based on his examination, Dr. Huibregtse assessed chronic rhinitis, probably persistent sinusitis with atypical infection plus allergic rhinitis. He prescribed Azithromycin, an antibiotic, and "Sinuklenz," a sinus remedy, and he further encouraged Kennedy to use Flunisolide nasal spray. (*Id.* ¶¶ 31–39.)

Dr. Huibregtse saw Kennedy for a follow-up visit on June 24, 2008. Kennedy continued to have post-nasal drainage and only occasionally yellow mucus. Dr. Huibregtse assessed chronic rhinitis, probably mostly allergic and made a plan to order a Neti-pot for use with Sinuklenz packets for 3 months. Dr. Huibregtse further prescribed Cetirizine, an antihistamine, as needed for allergy symptoms for 6 months. Kennedy returned to Dr. Huibregtse on September 5, 2008, for complaints of continued nasal congestion with post-nasal drainage and cough. Kennedy had soreness in his throat and drainage that did not improve despite a five-day course of Prednisone, an anti-inflammatory steroidal medication. On examination, Dr. Huibregtse found that Kennedy's nose was

congested but that his mouth and throat did not exhibit inflammation, discharge, or exudate. Dr. Huibregtse again assessed chronic rhinitis and prescribed Nasacort, a different nasal spray. (*Id.* ¶¶ 40–44.)

On November 10, 2009, Kennedy complained to Dr. Huibregtse that his symptoms had not been relieved by any combination of the antihistamines, decongestants, and other medicines Dr. Huibregtse had previously prescribed. On examination, Dr. Huibregtse found that Kennedy's nose was congested but that he had no sinus tenderness and his mouth and throat were without inflammation, discharge, or exudate. Dr. Huibregtse also indicated that Kennedy's neck was negative for lymphadenopathy (swollen lymph nodes), or thyromegaly (enlarged thyroid). Dr. Huibregtse again assessed chronic rhinitis, and he prescribed Phenylephrine, a decongestant, along with Guaifenesin, and Loratidine. He also ordered x-rays of Kennedy's sinuses, labs to check his level of Vitamin D and iron, and a radioallergosorbent test (RAST) for Northeast Wisconsin allergens. (*Id.* ¶¶ 45–49.)

Consulting Physician Asif Anwar, M.D., noted on November 13, 2009, that the x-rays revealed mild mucosal thickening in the maxillary sinuses consistent with chronic sinusitis. He found no evidence of cysts or polyps, and the frontal sinuses and nasal cavity appeared clear. Dr. Huibregtse reviewed the x-rays on November 17, 2009, and he prescribed a course of Augmentin for three weeks. He also prescribed a Vitamin D supplement on December 2, 2009, after testing revealed low levels of Vitamin D. (*Id.* ¶¶ 50–53.)

Dr. Huibregtse saw Kennedy for follow-up on February 22, 2010. He noted that Kennedy did not appear in distress but had some recurrence of congestion without fever, chills, or pain. On examination, Kennedy's mouth and throat had mild inflammation of the posterior oral pharynx with

a small amount of yellowish discharge. Dr. Huibregtse assessed a history of recurrent sinusitis with questionable acute exacerbation and prescribed Robitussin cough syrup, and Pseudoephedrine, a decongestant. Kennedy returned to Dr. Huibregtse on March 23, 2010, claiming continued nasal congestion, post-nasal drainage, and some yellow mucus discharge. Dr. Huibregtse found that his mouth and throat had mild inflammation of the posterior oral pharynx with no discharge or exudate and that his neck was negative for lymphadenopathy. Dr. Huibregtse prescribed Augmentin and Pseudoephedrine, and he made a note to consider a CT scan of the sinuses if symptoms persisted. (*Id.* ¶¶ 54–60.)

Kennedy attended a follow-up appointment with Dr. Huibregtse on May 19, 2010, at which Dr. Huibregtse indicated that Kennedy had apparently experienced some improvement on the Augmentin but then suffered an exacerbation of symptoms a month prior to his visit, including a left ear ache. Dr. Huibregtse found that Kennedy's mouth and throat were without inflammation, exudate, or discharge, and that his neck was free of lymphadenopathy or thyromegaly. He assessed allergic rhinitis and prescribed Zafirkulast, an anti-inflammatory, and Vitamin D. He also planned to make a referral to a radiologist for a CT scan of Kennedy's sinuses. (*Id.* ¶¶ 61–67.)

On June 7, 2010, the Waupun Memorial Hospital Radiology Department performed a CT scan of Kennedy's sinuses, which showed deviation of the nasal septum. Dr. Huibregtse reviewed the results of the CT scan with Kennedy on June 29, 2010, and on examination, he again found that Kennedy's mouth and throat were without inflammation, discharge, or swelling. Dr. Huibregtse assessed chronic recurrent rhinitis, probable allergic, with left nasal septal deviation, and he prescribed Pseudoephedrine and Neo-Synephrine nasal spray. On November 3, 2010, Kennedy reported to Dr. Huibregtse that the Pseudoephedrine did not effectively relieve his congestion but

that the nasal spray had been somewhat effective. Dr. Huibregtse assessed allergic rhinitis, persistent, and he ordered other tests related to Kennedy's blood composition and lipid levels. (*Id.* ¶¶ 68–75.) Less than two weeks later, Kennedy was transferred to JCI, and Dr. Huibregtse had no further contract with him.

In addition to the record of the care provided to Kennedy while at RGCI, Dr. Huibregste has offered his professional opinion based on his review of that record and her personal knowledge of the case to a reasonable degree of medical certainty that the care and treatment he provided to Kennedy at RGCI was reasonable and appropriate. (*Id.* ¶ 132.) Dr. Huibregste also states that to his knowledge and upon review of the medical record, there was no evidence of an enlargement or any masses on Kennedy's neck while he was under Dr. Huibregste's care at RGCI, nor did Kennedy ever make any complaints to him of a goiter or lump on his neck while he was under his care. (Suppl. Decl. of Charles Huibregtse, M.D., ¶¶ 7, 8, ECF No. 50.)

In response to the defendants' motion for summary judgment, and in support of his own, Kennedy offers evidence that he had a lump on his neck while under Dr. Huibregste's care at RGCI. Kennedy states in his own declaration that as early as late August 2008, he showed Dr. Huibregtse "a lump/goiter on his lower neck." (Kennedy Decl. ¶ 10, ECF No. 32.) Kennedy states that Dr. Huibregtse looked at his neck and stated that it was nothing to worry about. (*Id.*) On an unspecified later date, Kennedy states that Dr. Huibregtse refused to look at the lump, explaining "Lumps that are located in the neck of men are not commonly cancerous and generally go away on their own." (*Id.*) In addition, Kennedy alleges Dr. Huibregtse stated that "it was unnecessary to order further tests because RGCI's budgetary allowance would not support these types of requests/recommendations and nor will the administrative/medical committee approve those kind of

test [sic] concerning a lump/goiter in the throat and swallowing problems, but that he could continue to prescribe [Kennedy] (cold/sinus) medications with no problems." (*Id.*)

Although neither Kennedy's HSR forms nor Dr. Huibregtse's notes reference a lump on his neck, Kennedy submitted affidavits from Myrna Harris, his mother, and Aaron Watkins and Demitri Phillips, fellow inmates and RGCI, who attest that at some time during Kennedy's incarceration at RGCI, he showed them a lump at the bottom of his throat/neck area. (ECF Nos. 32-18, 32-19, & 32-20.) Harris also attests that she tried to express her concern about the lump as well as Kennedy's swallowing and breathing problems to RGCI medical staff and other officials at RGCI, but no one would speak with her about Kennedy's health. (ECF No. 32-20.)

As questionable as this evidence may be in light of the medical record and Kennedy's HSRs, the court cannot disregard it. In deciding a motion for summary judgment, the court is required to view the facts in the light most favorably to the non-movant. The fact that Kennedy's evidence conflicts with the medical record, including his own HSRs, does not constitute grounds for rejecting it. *See Newsome v. Chatham County Detention Center*, 256 Fed.Appx. 342, 346 (11th Cir. 2007) ("While it is true that Newsome's medical records do not support the version of the facts he presents in his affidavit, all this means is that there is conflict in the evidence, which we must resolve at the summary judgment stage in Newsome's favor.").

Kennedy's evidence in the form of his own declaration, along with those of his mother and fellow RGCI inmates create a genuine dispute over an issue of material fact. Dr. Huibregtse's opinion that the care and treatment he provided was medically sound is based on the fact that there was no lump on Kennedy's neck during the time he treated him. He does not contest Kennedy's assertion that if he did have a lump or enlarged thyroid during throughout the period of time Dr.

Huibregtse was treating him, further testing should have been ordered. Kennedy also offers evidence—again his own declaration—that Dr. Huibregste stated that the reason he was refusing to order more testing was because he wanted to save money. Of course, it makes no sense for a doctor who suspects a patient may have cancer to decline the medical tests that could confirm such a diagnosis if his goal is to save money. But again, that argument goes to the credibility of Kennedy's evidence, and summary judgment is not proper time to weigh evidence or assess credibility. If a jury were to believe Kennedy's evidence that Dr. Huibregtse knew of the likelihood that he had thyroid cancer and refused to test for it in order to save money, it could find that he was both negligent and deliberately indifferent to his serious medical needs. Accordingly, the defendants' motion will be denied as to Dr. Huibregtse.

It should go without saying that in the face of this evidence, Kennedy's motion for summary judgment on his claim against Dr. Huibregste must be denied. Accepting Dr. Huibregtse's version of the facts as true, a jury would necessarily find that Dr. Huibregtse was neither negligent in his care and treatment of Kennedy, nor deliberately indifferent to Kennedy's serious medical needs. Kennedy's motion for summary judgment is therefore also denied as to Dr. Huibregtse.

## 2. Dr. Adler

Kennedy was transferred to Jackson Correctional Institution on November 11, 2010, and he first visited Dr. Adler on February 11, 2011. Dr. Adler renewed Kennedy's prescription for Guaifenesin in response to his complaints of productive cough. Dr. Adler saw and treated Kennedy for complaints of shoulder pain March 17, March 28, and April 11, 2011, and at the April 11 visit, Dr. Adler ordered a refill of Kennedy's Guaifenesin. Dr. Adler's treatment notes for these visits make no reference to sinus or throat complaints. Dr. Adler met with Kennedy again on May 4, 2011,

14

to address complaints of shoulder pain, itchy eyes, and nasal congestion. He prescribed Loratidine and eye drops, but Kennedy declined a prescription of Flunisolide. (*Id.* ¶¶ 76–84.)

On May 31, 2011, Dr. Adler saw Kennedy for complaints of allergic symptoms, including increased nasal drainage and throat phlegm and itchy, watery eyes. On examination, Dr. Adler found that Kennedy's throat was not inflamed but he noted a possible symmetric goiter on his neck exam with each lobe measuring 4 cm x 4 cm x 1 cm thick. Dr. Adler changed Kennedy's prescription of Loratidine to Cetirizine, refilled Guaifenesin, and requested an ultrasound of the thyroid gland as well as a thyroid-stimulating hormone (TSH) test. Dr. Adler ordered the nursing staff to schedule a hypertension visit one month after the May 31 visit, and he states that he anticipated reviewing Kennedy's test results with him at that time. (*Id.* ¶¶ 85–90.)

An ultrasound of Kennedy's thyroid gland was conducted on June 10, 2011, and upon review, Julie Farrell, M.D., indicated that it revealed "thyromegaly with bilateral multiple nodules." On June 15, 2011, Dr. Adler made a note to review the thyroid ultrasound of the goiter with Kennedy at the next visit. Dr. Adler further noted that the TSH test was within normal limits. There is no record of Kennedy attending a hypertension visit that Dr. Adler had ordered the nursing staff to schedule in late June 2011. Dr. Adler next met with Kennedy on September 22, 2011, for follow-up on the goiter and continued complaints of nasal drainage and throat phlegm. Kennedy reported that his symptoms were getting worse, that the Cetirizine was not helping, that he had drainage out of his nostrils and in the back of his throat, and that he had been clearing his throat for over 3 years. Kennedy further stated he had a sour taste in the back of his throat at least once a day and that he had swelling in his lower anterior neck. On examination, Dr. Adler noted that Kennedy was not in any apparent distress and that while he frequently cleared his throat, his voice was not hoarse.

Kennedy's throat was not inflamed and his neck was negative for lymphadomopathy. Dr. Adler further found a symmetric goiter with lobes approximately 4 cm x 3 cm x 1 cm thick per lobe. Dr. Adler noted that the thyroid ultrasound showed multi-nodular goiter but the sizes of the nodules were not given. Dr. Adler assessed laryngeopharyngeal reflux for the throat clearing and multi-nodular goiters. He made a note to ask the radiologist about the size of the nodules, indicating that if the nodules were greater than 1 cm, an FNA (fine needle aspiration) biopsy would be needed, but if the nodules were less than 1 cm, a trial of levothyroxene would be tried. Dr. Adler planned to follow up in one month and planned to consider an ENT evaluation if the throat clearing did not improve in approximately two months. (*Id.* ¶¶ 91–99.)

On October 5, 2011, Dr. Farrell revised her review of Kennedy's ultrasound to include the size of the nodules. The following day, Dr. Adler signed off on Dr. Farrell's revised report and made a referral for an FNA biopsy of Kennedy's thyroid nodules and a follow-up endocrinology evaluation. In the meantime, on October 12, 2011, Kennedy had the episode the led to his trip to the emergency room at Black River Falls Memorial Hospital and the recommendation for an urgent endocrinology ENT referral for further evaluation and treatment. Shortly after he was returned to Jackson, Dr. Adler obtained the approvals and directed that arrangements be made for the further evaluation and eventual thyroidectomy at UW Hospital and Clinic.

Dr. Adler, like Dr. Huibregtse, has offered his own opinion to a reasonable degree of medical certainty based on their review of the medical record and his personal knowledge of the case that the care and treatment he provided was reasonable and appropriate. (*Id.* ¶ 133.) Dr. Adler adds that in his opinion, Kennedy's throat problems and his goiter were two separate conditions. Dr. Adler states he became aware of Kennedy's chronic cough as early as February 11, 2011, and his goiter

16

on May 31, 2011. (DPFOF ¶ 131.) Finally, Dr. Adler opines that Kennedy would have had to undergo a total thyroidectomy regardless of when the cancer was discovered or how large the nodules were when the cancer was diagnosed. (Suppl. Decl. of Kenneth Adler ¶ 9, ECF No. 51.)

Again, based on this evidence, Kennedy's motion for summary judgment must be denied. Accepting these facts as true, it is clear that Dr. Adler was neither negligent in his care and treatment of Kennedy, nor was he deliberately indifferent to his serious medical needs. It is a closer question whether summary judgment should be granted in favor of Dr. Adler. Again, Kennedy offers additional evidence not supported by the medical record.

As to Dr. Adler, Kennedy claims that he immediately complained to him about his throat problems when he arrived at JCI in November 2010 but was not seen until February 9, 2011. (Kennedy Decl. ¶ 19, ECF No. 32.) He asserts that from February to May 2011, he filed numerous medical request slips related to throat pain that were ignored. As a result, he asked Myrna Harris, his mother, and attorney friend Joshua Levy to contact James Greer, Director of Health Services, on his behalf. Harris and Levy submitted affidavits attesting that they did in fact contact Mr. Greer and express their concerns that Kennedy was not receiving adequate medical attention for his throat problem. (ECF Nos. 32-20 & 32-21.) Kennedy asserts that during his May 31, 2011 visit, Dr. Adler assured Kennedy that his throat symptoms would be taken seriously and that further calls from friends and family would be unnecessary and bothersome. (Kennedy Decl. ¶ 25.) Dr. Adler then performed an exam of Kennedy's neck and detected the goiter. (*Id.* ¶ 26.) After the ultrasound test confirmed to Dr. Adler on June 15, 2011, that Kennedy had an enlarged thyroid with multiple nodules, Kennedy contends that Dr. Adler inexplicably waited over three and a half months to see him, during which time Kennedy continued to file HSR forms related to his pain and swallowing

problems. (*Id.* ¶ 27.) He contends that some of his HSR forms were never returned to him. Kennedy states that he was "called to HSU" on September 22, 2011, and that Dr. Adler was upset because James Greer, his boss, had called him after speaking with Kennedy's friends and family. (*Id.* ¶ 28.) Dr. Adler then informed him that his goiter could be cancerous but that he needed to know the size of the nodules. (*Id.*) Kennedy asserts that Dr. Adler's delay in addressing his ultrasound results further delayed his cancer diagnosis and caused him to be rushed to the emergency room on October 12, 2011, because he was having trouble breathing and swallowing. (*Id.* ¶ 30.) He also argues that it was unnecessary for Dr. Adler to request the size of the nodules because the proper course of treatment was to order a biopsy in any event. Following Kennedy's thyroidectomy, Kennedy asserts that he continued to receive inadequate treatment. He claims Dr. Adler twice berated him for having his family members call James Greer and that either Dr. Adler or another physician delayed his receipt of his pain medications. (*Id.* ¶¶ 43–46.)

This evidence is also sufficient to raise a genuine dispute over a fact material to the case. In addition to earlier delays, Kennedy claims that Dr. Adler waited over three months after receiving the ultrasound results on June 15, 2011, to request the size of the nodules and to follow up with him. Kennedy claims that he suffered pain and other symptoms while awaiting his test results. He has submitted HSR's indicating that on September 9, 2011, he complained of having blood in his saliva, and on October 1, 2011, he complained of severe pain and blood in his throat. (ECF No. 32-2 at 2 & 5.) Kennedy has also submitted the record of his emergency room visit on October 12, 2011, which indicates that he had difficulty swallowing, pain in his throat, and a feeling that something was encroaching upon his airway. (ECF No. 32-6 at 2.)

18

"A delay in the provision of medical treatment for painful conditions—even non-life-threatening conditions—can support a deliberate indifference claim so long as the medical condition is 'sufficiently serious or painful.'" *Grieveson v. Anderson,* 538 F.3d 763, 779 (7th Cir. 2008) (internal citations omitted). In order to prevail on such a claim, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* (internal citations omitted). Kennedy has presented sufficient "verifying medical evidence" from which a reasonable jury could find that a 3-month delay in treatment caused him additional pain and suffering. *See Williams v. Liefer*, 491 F.3d 710, 715–16 (7th Cir. 2007) (holding that six hours of needless suffering constituted harm). He does not need expert testimony to show that Dr. Adler's treatment delays caused him additional pain and suffering. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("[A] non-trivial delay in treating serious pain can be actionable even without expert medical testimony showing that the delay aggravated the underlying condition."); *Williams*, 491 F.3d at 715–16 (rejecting argument that expert testimony is only acceptable form of "verifying medical evidence").

Moreover, Kennedy suggests that Dr. Adler may have delayed his treatment because he was angry that he persuaded his family and friend to contact his boss. Even though Dr. Adler has denied under oath that either Greer or any of Kennedy's family or friends ever contacted him regarding his treatment of Kennedy (Supp. Decl. of Kenneth Adler, M.D. ¶¶ 7, 8, ECF No. 51), I am required to accept Kennedy's version in deciding the defendants' motion for summary judgment. Under that version, a jury could find that Dr. Adler deliberately delayed treatment and thereby caused Kennedy

additional pain, including a trip to the emergency room. Such conduct, if found by the jury, could also constitute negligence. The defendants' motion for summary judgment must therefore be denied as to Dr. Adler as well.

## C. Motion for Appointment of Counsel

On January 17, 2014, Kennedy filed a motion seeking the appointment of counsel if his claims survived summary judgment. (ECF No. 72.) In support of his motion, Kennedy stated that the case is complex and he is not competent to represent himself. He notes that he has attempted to obtain counsel on his own but has been unsuccessful. He also states that as an inmate confined in a prison, he will have difficulty conducting the discovery he believes will be needed and to retain an expert to testify at trial. For all of these reasons and in the interest of justice, Kennedy contends that the court should appoint an attorney to represent him against the defendants.

Although civil litigants do not have a constitutional or statutory right to appointed counsel, district courts have discretion to recruit attorneys to represent indigents in appropriate cases pursuant to 28 U.S.C. § 1915(e)(1). Upon motion by the plaintiff, the Court is required to exercise its discretion and consider the factors set forth in *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (*en banc*). As a threshold matter, litigants must make a reasonable attempt to secure private counsel on their own. *Id*. at 654. Once this threshold burden has been met, the Court must address the following question: given the difficulty of the case, does this plaintiff appear competent to litigate it himself?" *Id*. at 654–655 (citing *Farmer v. Haas*, 990 F.2d 319, 321–22 (7th Cir. 1993)).

Kennedy has sent letters seeking counsel to five law firms, including several that generally accept such requests by the courts, but all declined to take his case on a pro bono or contingency fee basis. (ECF No. 73.) He has therefore satisfied the threshold inquiry. It also appears that the case

is somewhat complex. Kennedy has asserted both an Eighth Amendment claim of deliberate indifference to serious medical needs and a medical malpractice claim against two separate doctors. Although he has withstood a motion for summary judgment by the defendants, in order to ultimately prevail he will likely need at least one expert to testify at trial. And because he is indigent and confined in a prison, he cannot conduct the type of discovery, i.e. depositions of defendants and witnesses, that would normally occur in a case such as this.

On the other hand, Kennedy has failed to provide the court with any information about his level of education and general competence, other than the fact that he is of "sound" mind. (Kennedy Decl. In Supp. of Mot. for Appt. of Counsel ¶ 2.) Throughout the litigation, Kennedy has established a far greater ability to litigate his own claims than most inmates. He submitted facially satisfactory pleadings and successfully warded off the defendants' motion for summary judgment. He has also effectively communicated with the defendants and the Court when discovery disputes arose. His briefs have also demonstrated a better than average understanding of the applicable legal principles. Kennedy states that he has routinely received assistance from other inmates, but he fails to say what and how much they contributed to his filings. Thus, it is not clear that he is in a much different position than most inmates who object to the quality of the medical care they receive in prison.

In response to Kennedy's motion, I asked an attorney from the local office of a law firm that handles medical malpractice actions throughout the state to conduct the firm's usual initial evaluation of Kennedy's case to determine whether it merited the investment of time and resources that would be needed to bring it to conclusion. (ECF No. 76.) The firm was provided copies of Kennedy's complaint, the court's screening order, and the medical records that parties had filed with the court. Citing *Pruitt*, I noted that it could be considered an abuse of discretion if the court failed to recruit

counsel for an indigent prisoner in certain cases. I also noted, however, that no court has held that prison inmates have a greater right than non-prisoners to have counsel appointed or recruited by the court to bring suit on their behalf against another party.

Of course, as noted above, a claim of deliberate indifference to serious medical needs under the Eighth Amendment is not the same as a medical malpractice claim. Yet, because a claim of deliberate indifference to serious medical needs is centered on an allegation that appropriate care was not provided, it often encompasses medical malpractice. In other words, if an inmate cannot even make out a claim for medical malpractice against the health care providers involved, it would appear unlikely he could prove an Eighth Amendment violation. It was for this reason that I thought an evaluation of the case by a firm that regularly handled malpractice cases would be helpful to the determination whether the case merited the recruitment of counsel by the court. I also thought that if the case had merit, the firm might itself be willing to represent Kennedy and reminded it that if it prevailed, it could recover attorneys fees and its expenses from the defendants.

In this respect, this court's approach mirrored that favored by the Second Circuit in *Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170 (2d Cir. 1989). In *Cooper*, the court noted that district courts would perform a greater service to the disadvantaged and the cause of justice if, instead of recruiting private firms to provide attorneys to indigent plaintiffs whose cases survive a motion to dismiss, they took steps to insure that such cases were reviewed by lawyers who had experience with similar claims:

> Courts do not perform a useful service if they appoint a volunteer lawyer to a case which a private lawyer would not take if it were brought to his or her attention. Nor do courts perform a socially justified function when they request the services of a volunteer lawyer for a meritless case that no lawyer would take were the plaintiff not indigent. Courts would, however, significantly advance the justified claims of the

22

poor if they established mechanisms to insure that the claims of indigent, disadvantaged litigants will be reviewed by lawyers whose business is to pursue claims of similar nature. Such a brokerage service would be likely to find counsel for many with meritorious claims.

*Id.* at 174. Such a policy, the court noted, also favored the evenhanded administration of justice since it is not the poverty of the plaintiff that generally prevents him from getting an attorney to take his case. Only the very wealthy can afford to pay the attorneys fees and expenses necessarily incurred in bringing a lawsuit. "As a general proposition, the availability of counsel for claims by individuals is determined less by the wealth of the claimant than by the merits of the claim. The vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." *Id.* at 173. For this reason, "[t]he poverty of the claimant may often be irrelevant to his ability to secure counsel. If the claim is promising and relates to an injury that can be expected to produce substantial damages, a contingency lawyer will often be motivated to take it regardless whether the claimant is indigent or has property." On the other hand, the court noted in *Cooper*, "[a] claim that could not command a lawyer's acceptance if possessed by an employed middle-class property owner should not command a pro bono lawyer." *Id.*

On April 29, 2014, the firm furnished the court with its evaluation of the case. After summarizing the history, the firm provided its assessment of the medical issues in the case and the potential damages. On the question of liability, the firm found no clear evidence of medical negligence:

The medical records provided show that Mr. Kennedy was provided with various treatments for his ongoing symptoms. Mr. Kennedy's symptoms since 2007 of itchy, watery eyes, sinus pressure, coughing, and sneezing do not appear to be symptoms of thyroid cancer. Although Mr. Kennedy also intermittently complained of a sore

> throat and subsequent difficulty swallowing during that timeframe, it appears that those symptoms could have been related to sinus drainage in the back of his throat, and not necessarily a symptom of thyroid cancer. As such, it is our opinion that it would be difficult to prevail on a claim of delayed diagnosis of his thyroid cancer.

(ECF No. 79.) The firm also concluded that potential recovery, even if liability could be established was limited. Of course, even if he prevailed, Kennedy would not be entitled to recovery of any costs of medical care, assuming some portion of the care could be attributed to the delay in diagnosis, since all of his medical care was provided at no cost to him. And of course, since he is an inmate serving a sentence for a crime, he suffered no wage loss.

Even more important, it was doubtful that any delay resulted in significant harm. The firm noted that Kennedy was diagnosed with Stage 1 thyroid cancer and the survival rate for Stage 1 of the disease is 100%. Even if his cancer had been diagnosed earlier, it would still have been Stage 1 and therefore it was unlikely that any potential delay in his diagnosis resulted in significant progression of his disease or necessitated a significant change in his overall treatment process. (*Id.*) Based on its analysis, the firm concluded that neither it, nor any other firms that do any significant amount of medical malpractice work would be willing to invest the time and resources necessary to prosecute the claim.

In response to a further request from the court, the firm explained that its analysis of the medical issues in the case was based upon a review of the file material by the firm malpractice team, consisting of lawyers who practice in the area and paralegals with nursing degrees and significant experience in medical malpractice cases. Although the firm does have outside medical consultants that it regularly uses to evaluate cases, it did not use an outside consultant in this case because the issues were within the purview of the firm's malpractice team.

The firm also explained that it had also considered the cost of litigating the claim in relationship to what it concluded was a limited recovery even if it prevailed. The firm noted that "medical malpractice cases demand high caliber expert testimony." (ECF No. 82 at 1.) In this case, in particular, the firm noted that there would likely be a need for a general practioner expert regarding the standard of care for a prison doctor, an endocrine expert concerning the enlarged thyroid and thyroid nodules, and ENT expert concerning thyroid cancer and the thyroid surgery, and an oncology expert to address the radioactive iodine treatment. It would also be expected that the defense would retain experts in similar fields. The firm noted that experts of this kind general charge between $300 and $500 per hour, and the out-of-pocket costs for experts in this type of case could exceed $100,000 through trial. In addition, it would require hundreds of hours of attorney and paralegal time. Finally, the firm noted that in its experience medical malpractice cases generally did not settle short of trial, presumably because the physician's professional reputation was on the line. Thus, the firm concluded, "considering the limited damage potential, and the time and expenses that would necessarily be incurred in prosecuting the claim," it would not be willing to pursue the claim on Kennedy's behalf. (*Id.* at 2.)

Given the law firm's evaluation of Kennedy's claim, I would readily deny his request that I appoint, or to be more precise, recruit counsel for him, if I was in the Second Circuit. But as I recently explained in another deliberate indifference case, the law in the Seventh Circuit is significantly different. *See Rivera v. Kettle Moraine Correctional Inst.*, No. 14-C-006, 2014 WL 2875897 (E.D. Wis. June 24, 2014) (order granting motion for appointment of counsel). As noted above, the legal standard for deciding motions to recruit counsel under § 1915(e)(1) in this circuit requires the district court to consider the difficulty of the case and the pro se plaintiff's competence

to litigate it himself. *Pruitt*, 503 F.3d at 649. Noticeably absent from the list of factors *Pruitt* instructs district courts to consider in deciding such motions are the merits and substance of the plaintiff's claim.

More than twenty-five years before *Pruitt*, the Seventh Circuit had held that the merits of the case was the first of several factors that a district court should consider in deciding whether to recruit counsel. *Maclin v. Freake*, 650 F.2d 885, 887 (7th Cir. 1981) (per curiam). Moreover, the mere fact that the plaintiff's claim survived a motion to dismiss was not sufficient to warrant recruitment of counsel: "Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." *Id.* But even before *Pruitt*, the court had disgarded *Maclin*'s multi-factor test which began with consideration of the merits of the claim. In *Farmer v. Haas*, the court eliminated consideration of the merits beyond questioning whether it was "colorable," since "if the plaintiff doesn't even have a colorable claim, the case should be dismissed out of hand. There is no need to worry about counsel." 990 F.2d 319, 322 (7th Cir. 1993); *see also Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (noting that "[i]n *Farmer v. Haas* we discarded Maclin's multifactor test in favor of the following more straightforward inquiry: 'given the difficulty of the case, did the plaintiff appear to be competent to try it himself and, if not, would the presence of counsel have made a difference in the outcome?'").

The Seventh Circuit has also rejected the market approach seemingly favored by the Second Circuit in *Cooper* and by Judge Posner, at least in previous times. *See McKeever v. Israel*, 689 F.2d 1315, 1323-25 (7th Cir. 1982) (Posner, J., dissenting) ("Encouraging the use of retained counsel thus provides a market test of the merits of the prisoner's claim. If it is a meritorious claim there will be money in it for a lawyer; if it is not it ought not to be forced on some hapless unpaid lawyer.");

*see also Merritt v. Faulkner*, 697 F.2d 761, 768–69 (7th Cir. 1983) (Cudahy, J., concurring) ("I am not prepared to consign to the verdict of the marketplace the issue of prisoner representation"). Thus, the fact that a firm that specializes in personal injury cases has concluded that Kennedy's claim is not of sufficient merit or substance to invest its time and resources is not a factor the court can consider. Instead, the question before the court is "whether the difficulty of the case – factually and legally – exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Pruitt*, 503 F.3d at 655.

Even under the *Pruitt* standard, however, Kennedy has failed to demonstrate a need for court-recruited counsel. Although he has stated generally that he is not competent to represent himself, Kennedy has provided no specific evidence to support the assertion that he lacks the competency to coherently present his case to the judge or jury himself. In fact, he has already coherently presented his case to the court and has successfully withstood the defendants' motion for summary judgment, and as noted above, the quality of his filings far exceed those of most inmates. There is no indication in the record that his education or intelligence is limited. In fact, the declaration of his former attorney indicates that he owned a construction business prior to his incarceration, suggesting just the opposite. (Decl. of Joshua B. Levy ¶ 1.) In short, there is nothing in the record to suggest that Kennedy does not have the same, if not greater competence to represent himself as the vast number of other pro se litigants who cannot afford to hire and attorney and have been unable to convince one to take his case on a contingent fee basis.

It is true that the Seventh Circuit has suggested in several decisions that claims of deliberate indifference to serious medical needs are, by their very nature, complex. *See, e.g., Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010) (noting that "cases involving complex medical evidence are

27

typically more difficult for pro se defendants"); *Pruitt*, 503 F.3d at 655–56 (same); *Greeno*, 414 F.3d at 658 (noting that inmate's case is "legally more complicated than a typical failure-to-treat claim because it requires an assessment of the adequacy of the treatment that [inmate] did receive, a question that will likely require expert testimony").  But as is clear from the court's decision on the cross motions for summary judgment, the facts in dispute in this case are not as complex as most cases involving medical care.  The case presents essentially two factual issues: (1) Did Dr. Huibregtse ignore Kennedy's repeated complaints about a lump on his throat for almost four years?; and (2) Did Dr. Adler ignore similar complaints and then deliberately delay treatment for Kennedy's cancerous thyroid?  The resolution of these issues is primarily a question of credibility of witnesses.

This is not to say that Kennedy may not ultimately need an expert witness in order to prevail on his claims.  But the fact that an indigent litigant needs an expert to prove his case does not by itself entitle him to court-recruited counsel.  To adopt such a rule would mean that "a prisoner is entitled to appointment of counsel in any personal-injury case where a medical issue is raised."  *Merritt*, 697 F.2d at 771 (Posner, J., dissenting).  The Seventh Circuit has not gone that far.  In *Henderson v. Ghosh*, the court held that the district court abused its discretion in failing to recruit counsel for an inmate who claimed that the prison health care providers and other correctional staff were deliberately indifferent to his serious medical needs by failing to inform him of his declining kidney health until the defendant had "stage 5 kidney failure."  755 F.3d 559 (7th Cir. 2014).  The plaintiff in that case, however, had only a GED with little formal education and a low IQ.  Likewise in *Garner v. Sumnicht*, the court held in an unpublished decision that the district court abused its discretion in failing to recruit counsel for an inmate who claimed the prison doctors had acted with deliberate indifference in failing to effectively treat a chronic condition with symptoms similar to irritable bowel

syndrome. 554 Fed. App'x 500, 501 (7th Cir. 2014). But in *Garner*, the inmate claimed he was mentally ill. Kennedy makes no such claim here. To the contrary, he claims he is of "sound" mind. (Kennedy Decl. ¶, ECF No. 73.) Given the manner in which he has so far prosecuted his case, I find that he is competent to represent himself.

In sum, I conclude on the record before me that the difficulty of the case—factually and legally—does not exceed Kennedy's capacity as a layperson to coherently present it to the judge or jury himself. His motion for appointment/recruitment of counsel is therefore denied.

### III. CONLUSION

For the foregoing reasons, the defendants' motion for summary judgment (ECF No. 35) is denied. Kennedy's motion for summary judgment (ECF No. 29) is also denied, as is his motion for appointment/recruitment of counsel (ECF No. 72). The court may nevertheless attempt to recruit counsel for the limited purpose of assisting Kennedy at trial so as to expedite the presentation of evidence at trial as an aid to the court. Kennedy's motions to strike the court's letter to the law firm requesting its evaluation of the case and firm's two letters in response (ECF Nos. 78 & 83) are denied. The law firm was not appointed as a special master pursuant to Fed. R. Civ. P. 53, but instead asked simply asked to provide its evaluation of the case. The evaluation constitutes nothing more than the firm's opinion and is not admissible at trial. Since the court has cited to the firm's responses to the court's request in its decision (ECF Nos. 79, 82), however, the Clerk is directed to unseal both letters. Finally, the Clerk is directed to set this matter on the court's calendar for a telephone conference to schedule this matter for trial.

**SO ORDERED** this  30th  day of September, 2014.

                       s/ William C. Griesbach
                       William C. Griesbach, Chief Judge
                       United States District Court